United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DENNIS LEVI JIMENEZ,

Petitioner,

v.

JAMES WALKER, Warden,

Respondent.

_________________________________/

No. C 08-05489 YGR (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

## INTRODUCTION

This matter is now before the Court for consideration of Dennis Levi Jimenez's ("Petitioner") *pro se* Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254[1] concerning his 2005 conviction in Santa Clara County Superior Court. For the reasons set forth below, the Petition is DENIED as to all claims. In addition, no certificate of appealability will be issued.

## BACKGROUND

### I. Case History

On August 10, 2005, a Santa Clara County jury convicted Petitioner of first degree murder, and found true the special allegations that (1) Petitioner was a principal in the crime and at least one

[1] Hereafter, "Petition," Docket no. 1.

United States District Court
For the Northern District of California

principal intentionally and personally discharged a firearm, a shotgun, proximately causing death; (2) Petitioner committed the crime for the benefit of a street gang; and (3) Petitioner was armed with a firearm, a shotgun. (Ans., Ex. A at 1501, 1503–05.) On September 16, 2005, Petitioner was sentenced to a total term of fifty years to life. (Ans., Ex. A at 1558–60.)

On January 29, 2007, the California Court of Appeal affirmed the judgment of conviction. (Ans., Ex. F.) On May 9, 2007, the California Supreme Court denied Petitioner's petition for review without comment. (Ans., Ex. G.)

On November 1, 2007, Petitioner filed a state habeas petition in the California Supreme Court, which was denied on April 23, 2008, with a cite to *In re Waltreus*, 62 Cal. 2d 218 (1965). (Ans., Ex. H.)

On May 20, 2008, Petitioner filed a second state habeas petition in the California Supreme Court, which was denied on November 12, 2008, with citations to *In re Clark*, 5 Cal. 4th 750 (1993) and *In re Swain*, 34 Cal. 2d 300, 304 (1949). (Ans., Ex. I.)

On December 8, 2008, Petitioner filed the instant Petition. On April 28, 2009, the Court issued an Order to Show Cause. Respondent filed an Answer to the Petition, and Petitioner has filed a Traverse.

## II. <u>Facts</u>

In an unpublished opinion addressing Petitioner's claims on direct appeal, the state appellate court set forth the following summary of the facts:

> In the early morning hours of June 28, 2002, Jose Ramos (also known as Mongo) was shot and killed outside his home in Sunnyvale by a shotgun wound to the face. On his body, Jose had gang tattoos associated with a Sunnyvale Norteño gang and his blood tested positive for methamphetamine. Fragments of pellets and wadding found on Jose's body came from a 20-gauge shotgun and a shell estimated to be 10-20 years old. No witnesses saw the shooting or any cars or people leaving the scene. Several family members and neighbors heard one gunshot. One neighbor heard a car with a loud engine drive fast past her house after she heard the gunshot.
>
> Jose lived in his family home on Santa Susana Street with many family members, including his mother, several brothers, their wives or girlfriends and their young children. Jose stayed in a shed in the backyard. He was known to sell and use drugs (methamphetamine and marijuana). Jose as well as his brothers Eric Ramos (known as Eddie) and Sergio Ramos had associations with the Sunnyvale Norteño gang known as Varrio Via Sol (VVS).

United States District Court
For the Northern District of California

Many of the Ramos family members and several neighbors testified that a man known as Dennis (later identified as [Petitioner]) had come to the house to see Jose at least once and possibly twice earlier that evening. These witnesses had seen [Petitioner] visit Jose several different times recently, usually staying only briefly. The details of each witness's testimony differed from each other and from their first statements to the police. But all agreed that [Petitioner], driving a green Cadillac, had visited Jose that evening. Most witnesses said the visit was around 10:30 or 11:00 p.m. and that Jose and [Petitioner] seemed to be having an argument, with [Petitioner] behaving angrily.[2]

The police received a 911 call from Sergio Ramos at 2:19 a.m., but a caller a few minutes earlier identified a possible suspect as Dennis in a green Cadillac. Several days later, police were informed that the green Cadillac was at the home of [Petitioner's] brother. The car was clean when the police picked it up and it contained no evidence of blood, DNA or gunshot residue.

Several people testified to seeing [Petitioner] between the time he left the Ramos house and the time Jose was shot. [Petitioner's] former wife Gloria Jimenez testified that about 1 a.m. on June 28, 2002, [Petitioner] called her, saying he was on the front porch of her house where he had stayed some weeks prior. [Petitioner] said he had a job the next morning and he wanted to retrieve some tools from her garage where he had stored them. Gloria heard the gate close behind [Petitioner] about five or 10 minutes after he went to the garage. Around 7:00 a.m., Gloria received a phone call from her sister Margie Serna[3] who told her that [Petitioner] was a suspect in a shooting. Gloria called their son John to come over. When he arrived, she told him the news and they both cried. Later that day, when Gloria was not home, the police broke into her home and searched it. They had information from [Petitioner's] parole officer that he lived at that address (which was a mile or two from the Ramos home), so they did a parole search. When Gloria was interviewed later by the police, she told them that [Petitioner] had kept a gun in their closet in Modesto in 1994. She described the weapon as long and said that it opened in the middle to load. She asked [Petitioner] to get rid of the gun then and she never saw it again. She did not see the gun when she packed their belongings in the Modesto house to move to San Jose while [Petitioner] was in prison.

Vanessa Danilloff, a friend of the Ramos's, testified that she had been at the Ramos home in the evening and had seen a person who might have been [Petitioner] with Jose. She described Jose as yelling at the person in the green Cadillac, but she admitted she was under the influence of drugs and wasn't sure if the person in the car was [Petitioner] (whom she knew). Vanessa lived two blocks away from the Ramos house with her mother Margie Cerna and her brother Anthony, who was involved with gangs as was Vanessa. Around 1 a.m., Vanessa walked back to her house. Around 1:30 p.m., as she was making herself something to eat, [Petitioner] knocked on the door and asked for Anthony. [Petitioner] was wearing black jeans, a Pendleton shirt and a black stocking cap – different clothes than the person at the Ramos house had been wearing. Vanessa saw a small red car in the driveway. When [Petitioner] left (without Anthony), she saw him get into the car but she could not tell which side. When Vanessa was first interviewed by Detective Tim Ahearn of the Sunnyvale Public Safety Department soon after the shooting, she told him [Petitioner] got in the passenger side of the red car, which she identified as a red Plymouth Neon.

---

[2]One witness said Jose got into [Petitioner's] car briefly; others said he did not. Jose's fingerprints were found on the side passenger seat of [Petitioner's] car.

[3]Another witness in the case is named Margie Cerna.

[Petitioner's] son John Jimenez (age 22 at the time of trial) testified to receiving a phone call from [Petitioner] around 2:42 a.m. on June 28. [Petitioner] said he was at John's mother's house; he loved him and was okay but could not talk then. Both men were drug users at that time so late night calls were not unusual. In his initial interview with the police, John did not report this call, but told the police that he had not seen his father. John received several phone calls from [Petitioner] in the next few days and he eventually reported this to the police. John told the police his father said he was innocent. At the request of the police, John agreed to make pretext calls to [Petitioner], but [Petitioner] never answered his phone. John also remembered his father having a shotgun which opened in the middle, but he had not seen the gun since the family lived in Modesto 10 years earlier. In the afternoon of June 28, John and his cousin went to the home of Ramona Goytia,[4] where his father had been staying off and on, to pick up [Petitioner's] truck and saw.

[Petitioner] surrendered to the police on July 6 and was held on a parole violation. He was not charged with Jose's murder until March 2003.

In investigating the murder and [Petitioner] as a suspect, the police reviewed [Petitioner's] cell phone records during that period of time. These records showed phone calls to a cell phone connected to Harvey Fletcher, who was then on probation for drug possession. In October 2002, the police conducted a probation search of Fletcher's trailer home and arrested him. The search revealed a bag in the garage with [Petitioner's] clothes and cell phone. The search also revealed forged documents from a residential drug treatment program stating that Fletcher was currently in the program. Olivia Ruiz, Fletcher's girlfriend, also went to the police station to be interviewed. Following a private conversation with Ruiz (secretly taped by the police) about giving the police information on [Petitioner] in exchange for lenient treatment, Fletcher told the police the following: in June 2002, [Petitioner] had been doing work on Fletcher's kitchen. The two were friendly and used drugs together. Fletcher knew [Petitioner] was involved with Norteños. Early in the morning of June 29, [Petitioner] arrived at Fletcher's house and stayed for a couple of nights. The day before the shooting [Petitioner] had told Fletcher that he was looking for someone who owed him money for marijuana. ([Petitioner] kept a pound of marijuana at Fletcher's house.) When [Petitioner] showed up on June 29, he told Fletcher that the guy who owed him money was dead and that he did not do it, but he knew who did. He said he sent three people to get the money owed and something went wrong.

According to Fletcher, [Petitioner] said he went to talk to the person who owed him money. That person said, "If I was going to burn you, I'd just burn you." [Petitioner] replied, "No, you ain't gonna burn me, homeboy. You don't know who I am. XIV, homeboy. Norteño. Okay. That's who I am." [Petitioner] said he sent some younger Norteños over to collect the money but something went wrong. [Petitioner] described one of these people as an older guy who reported back to [Petitioner] that the victim was there and then he was gone. This person told [Petitioner] the victim's name and said they shot him with a shotgun at the side of his parents' house. [Petitioner] was sorry this happened.

[Petitioner] had driven to Fletcher's house in his green Cadillac which he washed and cleaned. The car was then picked up by someone else and [Petitioner] borrowed Fletcher's Bronco. [Petitioner] used Fletcher's phone to make several calls, then left his own phone and clothes in a bag in the garage. Several days later, [Petitioner] called to say he was in custody on a parole violation, but had not been charged with murder.

---

[4] Ramona Goytia testified that in June 2002 [Petitioner] stayed in her garage for a few days. She testified that on the night of June 27-28, [Petitioner] had been at her home since 9:30 p.m. and spent the entire night there. She did not tell the police this when they interviewed her in July 2002.

At the time of the police search of his home, Fletcher was on probation and supposedly attending a drug program. In fact, he had purchased and forged documents from a residential drug treatment program stating that he was attending. These forged documents had been sent to the court and to his probation officer. Fletcher had a criminal history and could have received six to eight years in prison when he was originally sentenced on drug possession charges in 2001. Instead, the trial court imposed a 16-month sentence and suspended it in order to allow Fletcher to enter a residential drug treatment program. When Fletcher was arrested following the search of his home, the suspended sentence was imposed and he served 16 months. He insisted at trial that he received no favorable treatment for his information about [Petitioner].

Fletcher's girlfriend Olivia Ruiz testified that [Petitioner] was in hiding at their house for a few days after the shooting. She said [Petitioner] denied committing the crime. She knew [Petitioner] was selling marijuana to earn money to buy a motorcycle. After [Petitioner] went to prison on the parole violation, he wanted Fletcher to sell the drugs for him and use the money for the motorcycle. Ruiz wanted Fletcher to stay away from drugs and his former lifestyle.

During the police investigation into [Petitioner's] cell phone calls near the time of the shooting, they discovered two other people: David Cornejo (originally charged with [Petitioner]) and Francisco Dominguez. [Petitioner's] phone records showed calls to a phone registered to Manuel Cadena III. Cadena said that the phone was used by many friends and family members at his house and that he actually lost the phone in a game of darts to David Cornejo, a long-time friend of his son Manuel Cadena IV (who lived in Sacramento). Cell phone records showed the Cadena phone was involved in some 350 calls in the 48-hour period beginning at midnight on June 28, many of which were to [Petitioner's] cell phone.[5] Location records showed the phone was in Sunnyvale near the Ramos house around the time of the shooting. The Cadenas denied knowing [Petitioner], although one of their relatives (Carlos Alvarez) had been working with and living with [Petitioner] around that time.

Phone records also showed the Cadena phone was involved around the time of the shooting in a series of 18 calls with a phone associated with Francisco Dominguez. At that time, Dominguez lived with his girlfriend and her sister, who had a red Neon car. Both women denied that Dominguez drove the car often. At trial, Dominguez testified under a grant of immunity. He was then in prison for robbery. Dominguez denied driving the red Neon, ever seeing [Petitioner] or Cornejo or telling the police his phone number.

In connection with the records of the cell phone calls, Russell Bentson, a radio engineer with Verizon, testified about the way cell phones work, in transmitting radio signals to cell sites or towers. Bentson explained that the majority of the time a cell phone connects with the geographically closest cell tower. Records are then automatically generated showing which tower transmitted each call. The records also show the number connected to, whether the call was incoming or outgoing, and how long the call was.

Both Detective Ahearn and Jesse Rodriguez testified as gang experts. Ahearn was familiar with the Ramos family and their gang associations. VVS is a Norteño gang operating in Sunnyvale. The neighborhood was relatively quiet at the time, but some Norteño/Sureño tension was present. Ahearn noted that in gang culture it was disrespectful to be a snitch and snitches were dealt with harshly. He also described gang structure and rules and observed that violence between Norteños is not allowed unless a young member disrespected an older member. Rodriquez was a former gang member who

---

[5]Many of these phone calls were to phone numbers associated with Cornejo.

> was cooperating with law enforcement in exchange for help on his current sentence. He also said that a gang member disrespecting another gang member would be physically harmed. Rodriguez had been in San Quentin with [Petitioner] in 2002 and knew he identified himself as Norteño.

*People v. Jimenez*, 2007 WL 215075, *1–*4 (Cal. Ct. App. 2007) (footnotes in original, renumbered).

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384–86 (2000), while the second prong applies to decisions based on factual determinations. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "A federal court may not overrule a state court for simply holding a view different from its own, when

the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340. Where constitutional error is found, habeas relief is warranted only if the error at issue had a "substantial and injurious effect on the verdict." *Penry v. Johnson*, 532 U.S. 782, 796 (2001) (citation omitted).

In determining whether the state court's decision is contrary to or involved an unreasonable application of clearly established federal law, or is based on an unreasonable determination of the facts, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claims in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). Here, the California Court of Appeal was the highest court to address, in a reasoned opinion, Petitioner's claims of *Batson* error, due process violation, and evidentiary errors. Thus, it is that opinion which the Court reviews when ruling on those claims.

If there is no reasoned state court decision on the petitioner's claims, the federal court must conduct "an independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. *Plascencia v. Alameida*, 467 F.3d 1190, 1198 (9th Cir. 2006). In the present case, there is no reasoned opinion from any California court addressing Petitioner's claims of ineffective assistance of counsel. Consequently, the Court will conduct an independent review of the record to determine whether the state court's denial of these claims was reasonable.

**DISCUSSION**

Petitioner raises the following claims for habeas corpus relief: (1) a denial of his Sixth and Fourteenth Amendment rights to equal protection and a trial by a jury drawn from a representative cross-section of the community under *Batson v. Kentucky*, 476 U.S. 79 (1986) (claim one); (2) a denial of his right to due process when the trial court allowed the prosecutor to argue Petitioner's guilt based on co-defendant Cornejo's criminal conduct related to the murder although the trial court had granted co-defendant Cornejo's motion for acquittal pursuant to Cal. Penal Code § 1118.1

United States District Court
For the Northern District of California

(insufficiency of the evidence); (3) a denial of his right to due process because of the erroneous admission and/or exclusion of certain evidence (claims three, four, five and six); and (4) a denial of his right to effective assistance of counsel (claims seven, eight and nine). Petition at 6–18.

**I. *Batson* Claim**

Petitioner argues that the prosecutor's fourteenth peremptory challenge was based on race and that the trial court erred in rejecting his *Batson* claim. The prosecutor used his first thirteen peremptory challenges without objection from defense counsel. The prosecutor's fourteen peremptory challenge, used to excuse Juror No. 3,[6] an African-American female, triggered a *Batson* objection from defense counsel. (Ans., Ex. B, Vol. 1 at 148.) In response to the questions that the trial court asked of all jurors, Juror No. 3 had provided the following information: she lived in San Jose, was single, had a minor child, and worked in the client services part of a testing lab. Juror No. 3 further stated that her mother was a pharmacist and her father was a truck driver. (*Id.* at 176–77.) Juror No. 3 had no further responses to any of the trial court's general voir dire and she was asked no specific questions by either counsel.

In his *Batson* motion, defense counsel argued that there was a *prima facie* case of the prosecutor's discriminatory intent because there was nothing "particularly unique" to Juror No. 3 that would justify her removal and the prosecutor had not asked her additional questions. (Ans., Ex. B, Vol. 2 at 149.) Defense counsel also argued that there was evidence of discriminatory intent because the prosecution had earlier excused Juror No. 61, whom defense counsel alleged was also African-American. (*Id.*) The trial court disagreed with defense counsel's characterization of Juror No. 61's ethnicity and found that Juror No. 61 was Latin American:

> Well, [Juror No. 61] could have been [African American], though there is nothing in the record to reflect she was. I keep track of my impressions of people's race, again, because I have to anticipate motions of this type and, unfortunately, I have to make notations. My impression of her is that she was not African American, and my impression based on the 14 challenges that the People have issued, is the only African American juror who was challenged was the one who's the subject or trigger of this motion . . . As I recall [Juror No. 61], this was the juror whose husband was a lawyer who formerly practiced criminal defense work and now did workers' compensation work. And she revealed his name and it sounded Latin American to me as well. I don't believe there is any evidence to

[6]For ease of reference, the Court refers to jurors by the numbers that were assigned to them at the time they were excused.

United States District Court
For the Northern District of California

suggest that that person was African American.

(*Id.* at 149–50.) Defense counsel responded by arguing that there was a "substantial reduction in the statistical likelihood and opportunity to have persons with an African American background on this particular jury because of, even at the minimum, a dismissal of a single juror." (*Id.* at 151.) The trial court denied defense counsel's *Batson* motion:

> Well, let me just make something clear. The record does not support that there was [sic] two African Americans removed from this jury. You have not made an adequate record that juror (name deleted) was African American. That is speculation. My observation of her leads me to disagree with you. But the bottom line is there is no record she is African American. Obviously, the last juror was African American. . . .I don't think you have come close to a *prima facie* showing as it relates to this motion. Believe me there are few things that I detest more than discrimination. Let me say that at the very outset. And if I even thought you were close to a *prima facie* showing I would require the District Attorney to justify his exercise of the last peremptory challenge. As I pointed out, I keep track of these things in the anticipation of a possible motion being brought so that I have some idea of what the record is. But you haven't made the *prima facie* showing, therefore, I am not going to ask the People why they exercised the last peremptory challenge. I am not going to quash the jury panel.

*Id.* at 152.

The state appellate court rejected Petitioner's claim as follows:

> I. *Wheeler/Batson* Error[7]
>
> [Petitioner] first contends that the prosecutor's peremptory challenge of an African-American prospective juror violated his federal constitutional right to equal protection and his state constitutional right to a jury chosen from a representative cross-section of the community.
>
> A. Legal Principles
>
> "A prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias – that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds' – violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*Wheeler*, *supra*, 22 Cal.3d at pp. 276-277; *People v. Griffin* (2004) 33 Cal.4th 536, 553.) Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. (*Batson*, *supra*, 476 U.S. at p. 88; *see also People v. Cleveland* (2004) 32 Cal.4th 704, 732.)" (*People v. Avila* (2006) 38 Cal.4th 491, 541.)
>
> In *People v. Gray* (2005) 37 Cal.4th 168, 186, our Supreme Court quoted from a recent United States Supreme Court case in reviewing the format that has developed to evaluate a *Wheeler*/*Batson* claim: "The United States Supreme Court recently reiterated the applicable legal standards. 'First, the defendant must make out a *prima facie* case "by

---

[7] *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).

United States District Court
For the Northern District of California

showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a *prima facie* case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination."' (*Johnson v. California* (2005) 545 U.S. 162, ---- [125 S.Ct. 2410, 2416]; *see People v. Cornwell* (2005) 37 Cal.4th 50, [67-68] (*Cornwell*).) [¶] In order to make a *prima facie* showing, 'a litigant must raise the issue in a timely fashion, make as complete a record as feasible, [and] establish that the persons excluded are members of a cognizable class.' (*People v. Boyette* (2002) 29 Cal.4th 381, 422.) The high court recently explained that 'a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' (*Johnson v. California*, *supra*, 545 U.S. at p. ---- [125 S.Ct. at p. 2417].) 'An "inference" is generally understood to be a "conclusion reached by considering other facts and deducing a logical consequence from them." ' (Id. at p. ----, fn. 4 [125 S.Ct. at p. 2416, fn. 4].) [¶] We explained in *People v. Howard* (1992) 1 Cal.4th 1132, 1155, that when a trial court denies a *Wheeler* motion finding the objector failed to make a *prima facie* case of group bias, the reviewing court should consider the entire record of voir dire of the challenged jurors. (*See People v. Davenport* (1995) 11 Cal.4th 1171, 1201.) That view is consistent with the high court's recent reiteration of the applicable rules, which require the defendant to attempt to demonstrate a *prima facie* case of discrimination based on the 'totality of the relevant facts.' (*Johnson v. California*, *supra*, 545 U.S. at p. ---- [125 S.Ct. at p. 2416].)"[8]

"We review the trial court's ruling on the question of purposeful racial discrimination for substantial evidence. [Citation.] It is presumed that the prosecutor uses peremptory challenges in a constitutional manner, and we give deference to the court's ability to distinguish 'bona fide reasons from sham excuses.' [Citation.]" (*People v. Avila*, *supra*, 38 Cal.4th at p. 541.)

B. Factual Background

On the second day of jury selection, after the prosecutor used a peremptory challenge to excuse an African-American juror (Juror No. 3) from the jury panel, defense counsel raised a "*Batson*/*Wheeler* objection." After releasing the potential jurors for the day, the trial court conducted a brief hearing and denied [Petitioner's] motion to quash the jury panel, stating "I don't think you have come close to a prima facie showing...."

At the time of [Petitioner's] objection, several potential jurors from a second jury venire of 75 people had been seated in addition to those from the first venire. Defense counsel pointed to Juror No. 3 as well as an earlier-challenged Juror No. 1 as the only African-Americans to have been seated on the jury, both peremptorily challenged by the prosecutor. The trial court disagreed that Juror No. 1 was African-American and no further evidence was offered. The prosecutor had already peremptorily challenged 13 seated jurors when he challenged Juror No. 3. This juror began as Juror No. 14 and told the court that

---

[8]Although as the Attorney General notes, *Johnson v. California* was issued a few days after the jury voir dire in this case, the record does not reflect any use of an incorrect standard of evaluation by the trial court. In *Johnson*, the high court held that one particular wording of the California standard to assess a *prima facie* case of discrimination – "more likely than not" – is an inappropriate yardstick by which to measure the sufficiency of a *prima facie* case. The proper standard is whether the objector has presented facts that give rise to an inference of discriminatory purpose. (*Johnson v. California*, *supra*, 545 U.S. at p. ---- [125 S.Ct. at p. 2416].) As this is a legal issue, we review the record to resolve whether it supports an inference that the prosecutor excused a juror on the basis of race. (*People v. Cornwell*, *supra*, 37 Cal.4th at p. 73.)

she was a single mother of a young child, lived in San Jose and worked in client services of a testing lab. Her mother was a pharmacist and her stepfather was a truck driver. She had no further responses to any of the trial court's general voir dire and she was asked no specific questions by any counsel. In raising his objection, [Petitioner] noted that there was nothing unique about this juror except her race which would have caused her to be challenged.

The trial court explained: "I don't think you have come close to a *prima facie* showing as it relates to this motion. Believe me there are few things that I detest more than discrimination. Let me say that at the very outset. And if I even thought you were close to a *prima facie* showing I would require the district attorney to justify his exercise of the last peremptory challenge. As I pointed out, I keep track of these things in the anticipation of a possible motion being brought so that I have some idea of what the record is. But you haven't made the *prima facie* showing; therefore, I am not going to ask the People why they exercised the last peremptory challenge. I am not going to quash the jury panel."

C. Analysis

In [Petitioner's] view, the trial court must have based its decision that a *prima facie* case of discrimination had not been made on the fact that only one African-American juror had been challenged. [Petitioner] emphasizes that the exclusion of even one potential juror can give rise to an inference of discriminatory purpose. (*See People v. Silva* (2001) 25 Cal.4th 345, 386; see also *Batson v. Kentucky, supra*, 476 U.S. at pp. 95-96; *J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127, 142, fn. 13.) He asserts that there was no possible nondiscriminatory reason for the juror to be peremptorily challenged because the prosecutor had asked no questions of the challenged juror. [Petitioner] requests that his conviction be reversed or in the alternative, that the case be remanded for a further hearing on this issue. (*See People v. Garcia* (2000) 77 Cal.App.4th 1269, 1282-1283.) "A presumption exists that a prosecutor has exercised his or her peremptory challenges in a constitutional manner. [Citations.]" (*People v. Crittenden* (1994) 9 Cal.4th 83, 114-115.) In addition, "when a trial court denies a *Wheeler* motion without finding a *prima facie* case of group bias the reviewing court considers the entire record of voir dire. [Citations.] As with other findings of fact, we examine the record for evidence to support the trial court's ruling. Because *Wheeler* motions call upon trial judges' personal observations, we view their rulings with 'considerable deference' on appeal. [Citations.] If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm. [Citation.]" (*People v. Howard* (1992) 1 Cal.4th 1132, 1155.)

The Attorney General first points out that [Petitioner] failed to make a complete record in that the second venire contained at least one African-American who might have been a final juror, and nothing was on the record about the third venire in terms of ethnic background of the potential jurors. While this later evidence may indicate the prosecutor's good faith (*see People v. Snow* (1987) 44 Cal.3d 216, 225), the trial court was evaluating whether in challenging the only African-American juror seated on the panel at the time, the prosecutor had shown by inference a discriminatory purpose. But there is no complete record of the ethnic background of all other potential jurors even in the first venire. In addition, the prosecutor had used 13 peremptory challenges before challenging Juror No. 3, 11 of these challenges occurred after Juror No. 3 was seated on the jury panel.

As our Supreme Court noted in *People v. Crittenden, supra*, 9 Cal.4th at p. 119, that "[a]lthough the prosecutor's excusal of all members of a particular group may give rise to an inference of impropriety, especially if the defendant belongs to the same group, that inference, as we have observed, is not dispositive. [Citations.] Moreover, in the present case the inference is of less weight, because the prosecutor excused only a single member of that group." The court went on to comment that the trial judge had presided over voir dire and thus was in a good position to determine from all the relevant

> circumstances whether the prosecutor might have challenged the juror solely by reason of group association. This factor was also noted in the case of *People v. Box* (2000) 23 Cal.4th 1153, 1189, that the trial judge had performed much of voir dire and observed the remainder so was in the best position to determine under "'all the relevant circumstances'" whether a *prima facie* showing existed.
>
> Here, the trial judge was similarly situated and obviously observed voir dire closely in anticipation of any possible challenges. In fact, the judge conducted the majority of the general voir dire. (*See* Code Civ. Proc., § 223.)
>
> [Petitioner] points to the fact that the prosecutor failed to further question Juror No. 3 and thus had no possible ground for challenging her. Although a peremptory challenge cannot be based on group bias, a party may exercise a peremptory challenge for any permissible reason or for no reason at all. (*People v. Huggins* (2006) 38 Cal.4th 175, 227.) Moreover, the Attorney General points to one other peremptorily challenged juror that the prosecutor declined to question. Only if an inference of discrimination is raised by considering all relevant circumstances does the prosecutor need to justify peremptory challenges. The mere fact that the only sitting African-American juror was challenged does not, by law, raise an inference of discrimination when the trial court has carefully considered the matter in light of all relevant circumstances. Various cases have held that no inference of discrimination was raised when the prosecutor used several peremptory challenges to strike all sitting jurors of a particular identifiable group. (*See*, for example, *People v. Box*, *supra*, 23 Cal.4th at p. 1189 [no *prima facie* case established when defense counsel stated that prosecutor challenged the only two blacks on the panel]; *People v. Jones* (1998) 17 Cal.4th 279, 293 [no *prima facie* case where prosecutor challenged four black jurors, leaving none on panel]; *see also U.S. v. Vasquez-Lopez* (9th Cir.1994) 22 F.3d 900, *cert. den.* 513 U.S. 891 [fact that the challenged juror was the one Black member of the venire does not in itself raise an inference of discrimination].)
>
> In raising his *Batson-Wheeler* objection, defense counsel also claimed the prosecutor earlier had peremptorily challenged another woman, whom defense counsel asserted was African-American. She was the first juror No. 1, whose husband was a workers compensation lawyer with a last name of Castro who may have practiced criminal law at some point in the past. The trial court stated that juror No. 1 was not African-American and the record contains no further information on her heritage. On appeal, [Petitioner] argues that either this juror was Latin American or African American or a mixture of the two, and thus the prosecutor struck "both of the two minority jurors (100 [percent]) who had made it to the jury box, clearly a sufficient statistical showing of discrimination to make out a *prima facie* case." But the record does not disclose what the ethnic heritage of juror No. 1 was nor does it disclose the heritage of the rest of the jury panel or venire.
>
> Our review of the record finds substantial evidence in support of the trial court's ruling that no *prima facie* case of impermissible discrimination was made.

*Jimenez*, 2007 WL 215075 at *5–*8 (footnote in original, renumbered).

The Equal Protection Clause forbids the challenging of potential jurors solely on account of their race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). A violation of equal protection under *Batson* is established in a three-step process. In the first step, the defendant must make out a *prima facie* case that the prosecutor has exercised peremptory challenges on the basis of race "by showing

United States District Court
For the Northern District of California

that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 93–94. Here, the trial court found that Petitioner failed to make out the *prima facie* case of prosecutorial discrimination and therefore did not proceed to the remaining two steps of the *Batson* analysis.

In order to establish a *prima facie* case of discrimination, the defense must show: (1) the defendant is a member of a cognizable racial group; (2) the prosecution has removed members of such a racial group; and (3) circumstances raise an inference that the challenges were motivated by race. *Batson*, 476 U.S. at 96. To satisfy *Batson*'s first step, a defendant need not persuade the judge that the challenge was more likely than not the product of purposeful discrimination; rather, he need only produce evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. *Johnson v. California*, 545 U.S. 162, 171–72 (2005). "[The Ninth Circuit] has held that the striking of only one prospective juror with discriminatory purpose violates the Constitution. However, the striking of one juror of a cognizable racial group does not by itself raise an inference of discriminatory purpose. Instead, the trial court must consider the totality of relevant circumstances. The trial judge, experienced in supervising voir dire, is in the unique position of observing the voir dire firsthand, as well as the prosecutor's questions and statements during examination, an activity that may support or refute an inference of discriminatory motive." *Tolbert v. Gomez*, 190 F.3d 985, 988 (9th Cir. 1999) (internal citations omitted).

The state court's ruling on whether Petitioner established a *prima facie* case of prosecutorial discrimination is entitled to a "presumption of correctness" on federal habeas review where the state court applied the correct "raise an inference" standard rather than the "strong likelihood"/"more likely than not" standard in evaluating a *Batson*/*Wheeler* claim. *See Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999) ("In fact, because the Batson *prima facie* determination is so factually based, it would be proper to apply the presumption of correctness allotted to factual issues by pre-AEDPA habeas law.") (internal citation omitted). Unless something in the record vanquishes this presumption, a state court's decision that the Petitioner did not establish a *prima facie* case of a discriminatory use of a peremptory challenge must be upheld. *See Tolbert*, 190 F.3d at 989 (rejecting suggestion that striking prospective juror on the basis of his opinions on race was

United States District Court
For the Northern District of California

equivalent to striking him on the basis of his race).

Here, contrary to Petitioner's assertion, the state court applied the correct "raise an inference" standard set forth in *Batson*. *See Jimenez,* 2007 WL 215075 at *5–*6 and n.6. Accordingly, the state court's finding that Petitioner failed to make a *prima facie* case of discrimination is entitled to a presumption of correctness. Petitioner has not demonstrated that anything in the record vanquishes this presumption of correctness. In fact, Petitioner has failed to develop the record at all. The only two facts which Petitioner relies on to make a *prima facie* case of discrimination are the same facts which Petitioner relied on at trial in making his *Batson* motion: (1) the challenged juror was the only African American on the jury at the time, and (2) the prosecutor did not ask the challenged juror any questions during voir dire. Petitioner did not further develop the record in his state appellate proceedings, state collateral proceedings, or federal habeas petition.

A close review of the record fails to support a *prima facie* case of discrimination. The record shows that Juror No. 3 was not the first, nor the only, juror to be challenged by the prosecutor without any questioning. Prior to excusing Juror No. 3, the prosecutor also declined to question Juror Nos. 6 and 10. Although the prosecution did have information regarding Jurors No. 6 and 10 beyond their biographical summaries because both were the subject of additional questioning by both the trial court and defense counsel, the additional information was not clearly pro-prosecution.[9] In addition, the record shows that six or seven members of the jury were not African-American (five from before the *Batson* challenge and at least one of the two from the second venire) but does not show how many, if any, of the remaining jurors or alternates were African American. The record also does not show if the prosecutor's remaining challenges were used on African Americans.

---

[9]Juror No. 6 informed the court that due to her mother's job as office manager for the narcotics enforcement agency, she would sometimes socialize with some of the undercover narcotics agents. (Ans., Ex. B, Vol. 1 at 81.) In response to questions posed by defense counsel, she stated that she had found herself in a position where she changed her opinion about something based on a re-examination of the facts. She agreed with defense counsel that police officers could sometimes find themselves in the same position and that police officers sometimes made judgments before having all the facts. (*Id.* at 138.)

Juror No. 10 informed the court that she had been previously been excused from a jury. She also stated that her prior experience with jury selection could affect her ability to be fair. Specifically, she had wanted to take into consideration the potential sentence faced by a defendant. (*Id.*, Vol. 2 at 107–08.) She told defense counsel that she was comfortable deciding the case without being influenced by her personal feelings about the lifestyle of the witnesses and defendants in the case. (*Id.* at 113–14.)

In short, the Court finds that the record does not support vanquishing the presumption of correctness due the state court's decision that Petitioner failed to establish a *prima facie* case of a discriminatory use of a peremptory challenge. *See Tolbert*, 190 F.3d at 989. Given the totality of the circumstances, the prosecution's use of its fourteenth challenge on the only African-American juror on the panel at that time without further voir dire does not support a *prima facie* case of discrimination. The state court's rejection of this claim was neither contrary to, nor an unreasonable application, of clearly established federal law; nor was it based on an unreasonable determination of the facts. Accordingly, Petitioner is not entitled to habeas relief on this claim.

## II. <u>Due Process Violation in Allowing Prosecutor to Refer to Co-defendant's Guilt</u>

The trial court granted co-defendant Cornejo's motion for acquittal pursuant to Cal. Penal Code § 1118.1, which provides that a trial court may "order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal." Cal. Penal Code § 1118.1. Based on this ruling, Petitioner requested that the trial court prohibit the prosecutor from arguing a theory of the case that relied on Cornejo's knowing participation in any sort of criminal conduct related to the homicide. (Ans., Ex. B at 3225.) The trial court denied Petitioner's request and, in his closing argument, the prosecutor referred to Cornejo's involvement in the homicide.

Petitioner argues that the prosecutor's reliance on Cornejo's involvement violated his due process rights by allowing the jury to draw an impermissible inference. Petition at 11. The state appellate court rejected Petitioner's argument:

> **II.** ***Reliance on Evidence of Acquitted Codefendant's Culpability***
>
> Next, [Petitioner] argues that the trial court violated his rights to due process and a fair trial by permitting the prosecutor to argue [Petitioner's] guilt based on evidence of a codefendant's culpability after granting the codefendant's motion for acquittal.
>
> **A.** ***Factual Background***
>
> Codefendant David Cornejo was charged and tried jointly with [Petitioner]. Cornejo was charged with the crimes of murder and accessory after the fact. The prosecutor's theory was that [Petitioner] and Cornejo were in frequent cell phone contact around the time of the murder and that Cornejo, who knew both [Petitioner] and Francisco Dominguez (the alleged driver of the red Neon), was the connection between these two men. During the defense presentation at trial, the court granted Cornejo's motion to dismiss the charges under Penal Code section 1118.1. The court denied [Petitioner's] request to prohibit the prosecutor from arguing to the jury that Cornejo knowingly participated in any sort of

> criminal conduct related to the homicide. In closing argument, the prosecutor asserted that the jury did not have to make a finding that either Cornejo or Dominguez was involved in the murder, but that the evidence showed that Cornejo was sent by [Petitioner] to be involved in the crime and that he was the link between [Petitioner] and Dominguez and communicated with both of them before and after the crime.
>
> **B. *Legal Analysis***
>
> In *People v. Crittenden*, *supra*, 9 Cal.4th 83, the Supreme Court explained, "The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to [Penal Code] section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, 'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged.' [Citations.]" (*Id.*, at p. 139, fn. 13; *see also People v. Huggins* (1997) 51 Cal.App.4th 1654, 1656.)
>
> [Petitioner] interprets this standard to mean that the evidence was such that no reasonable trier of fact could have found Cornejo guilty and thus his rights to due process and a fair trial were violated by the trial court allowing the prosecutor to make the argument that Cornejo was intimately involved in the murder, i.e. guilty in some way. [Petitioner] has no direct support for this proposition that the prosecutor's argument in some way violated his constitutional rights. He relies on the case of *People v. Grant* (2003) 113 Cal.App.4th 579, where the reviewing court reversed a conviction when the prosecutor urged the jury to draw impermissible inferences in closing argument. But in that case, the prosecutor's reference was to evidence on one count that was not legally cross-admissible on a second count. The trial court here did not find that any evidence concerning Cornejo was legally inadmissible nor did the court find that he was factually innocent. Rather, the court simply found that the evidence presented was not sufficient to support a guilty verdict against Cornejo on the charged counts.
>
> The Attorney General suggests that this position is consistent with the well-established rule in the area of issue estoppel, that an adverse factual finding will foreclose the prosecution from proving a given fact only if the adverse finding necessarily decided the fact-to-be proved, among other things. He points to the cases of *Standefer v. United States* (1980) 447 U.S. 10 [the fact that a revenue official has been acquitted of improperly accepting compensation does not estop the government from prosecuting a defendant for aiding and abetting that crime based on the same factual theory that the jury rejected in acquitting the official] and *Dowling v. United States* (1990) 493 U.S. 342 [in prosecution for robbery, state may introduce evidence that defendant committed burglary, notwithstanding defendant's prior acquittal on that charge, because the issue of burglary was not an ultimate issue in the robbery prosecution], and contrasts the case of *Ashe v. Swenson* (1970) 397 U.S. 436 [defendant charged with robbing one of six poker players; only issue at trial is identity of robber; defendant's acquittal bars prosecution from trying defendant for robbing another poker player].
>
> [Petitioner] raises no claim that the evidence concerning Cornejo was somehow wrongly admitted or violated his rights to due process and a fair trial. The prosecutor was entitled to refer to that evidence in making his case to the jury. The jury itself was charged and instructed with finding the requisite evidence to conclude that [Petitioner] was guilty of murder beyond a reasonable doubt. We see no error.

*Jimenez*, 2007 WL 215075 at *8–*9. There is no clearly established Supreme Court law that prohibits the prosecutor from referring to properly admitted evidence regarding Cornejo's

United States District Court
For the Northern District of California

involvement in the events surrounding the crime, even where the trial court has found that the evidence was insufficient to convict Cornejo of the crime itself. Nor is there any clearly established Supreme Court law that prohibits a prosecutor from stating that a co-defendant was "involved" in the crime where the trial court had granted the co-defendant a judgment of acquittal based upon a finding of insufficient evidence. To the contrary, the Supreme Court has found that testimony regarding prior similar acts of which the defendant was acquitted may be introduced in other cases where the prior acquittal "did not determine an ultimate issue" in the other case. *Dowling v. United States*, 493 U.S. 342, 348 (1990). The state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief on this claim.

## III. <u>Evidentiary Errors</u>

### A. Exclusion of Evidence

Petitioner argues that his constitutional rights were violated by the trial court's refusal to allow him to impeach prosecution witness Harvey Fletcher with Fletcher's use of proceeds from a bank robbery to buy a motorcycle. At trial, Fletcher testified that Petitioner was involved in the sale of drugs in order to buy a motorcycle. Defense counsel argued that if the jurors knew that Fletcher's motivation for prior criminal conduct was the same motivation that he had ascribed to Petitioner's drug-dealing, the jurors would find the similarity too coincidental and doubt Fletcher's credibility. The trial court excluded testimony regarding Fletcher's motorcycle purchase on the grounds of relevance.

The Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation omitted). The exclusion of defense evidence will violate due process if it deprives the defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful testing. *Id.* at 690–91 (internal citations and quotations omitted) (holding that trial court violated due process by excluding petitioner's proffered evidence suggesting that his confession was involuntary, where resulting conviction rested on little evidence other than the confession itself). However, the right to present evidence in one's defense is not unlimited. State rules which operate to exclude evidence from

United States District Court
For the Northern District of California

criminal trials do not abridge a defendant's right to present a complete defense to the charges against him if the rules are not arbitrary or "disproportionate to the purposes they are designed to serve." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (internal citations and quotations omitted). But "at times a state's rules of evidence cannot be mechanistically applied and must yield in favor of due process and the right to a fair trial." *Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) (finding California's application of its evidentiary rules to exclude hearsay testimony that bore persuasive assurances of trustworthiness and was critical to the defense violated right to present evidence). To merit habeas relief, the petitioner must show that the court's evidentiary ruling rendered the trial so arbitrary and fundamentally unfair that it violated due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984).

The state court rejected Petitioner's claim, finding that excluding testimony regarding Fletcher's use of his bank robbery proceeds did not violate Petitioner's constitutional right to present a complete defense:

> The prosecutor questioned witness Harvey Fletcher about his 1978 conviction for unarmed bank robbery and his sentence to a drug program. On cross-examination, defense counsel asked Fletcher about his conversations with the police and whether he had told them he understood [Petitioner's] sale of drugs to be related to the purchase of a motorcycle. Fletcher agreed. Defense counsel then asked: "Is it a coincidence that the proceeds from your bank robbery conviction were used to buy a motorcycle?" The trial court sustained the prosecutor's objection on the grounds of relevance. Later, defense counsel explained that the proffered evidence was relevant because it was not coincidental that Fletcher's prior criminal conduct was related to the purchase of the motorcycle while he gave the police that same story regarding [Petitioner]. In other words, [Petitioner] is arguing that such evidence would have had a significant bearing on Fletcher's credibility. [Petitioner] maintains that the trial court violated his right to due process and to present a defense by excluding this evidence.
>
> First, we observe that our Supreme Court has repeatedly stated that excluded evidence does not usually deprive a defendant of his constitutional right to present a defense. "Application of the ordinary rules of evidence, as the trial court did here, does not impermissibly infringe on a defendant's right to present a defense. (*People v. Hall* (1986) 41 Cal.3d 826, 834.)" (*People v. Mincey* (1992) 2 Cal.4th 408, 440; *see also, People v. Rodriguez*, *supra*, 20 Cal.4th at p. 10, fn. 2.)
>
> Furthermore, as [Petitioner] acknowledges, Fletcher's credibility had been thoroughly attacked with his criminal history and associations, his many contradictory statements, and his recent forgeries perpetrating fraud on the court and the probation department. More important, the jury was presented with other credible evidence that [Petitioner] was interested in buying a motorcycle with the help of Fletcher and Olivia Ruiz. Ruiz testified that sometime before the murder, [Petitioner] rode Fletcher's motorcycle and decided he wanted to buy one like it. She also testified that when she found marijuana in their garage after [Petitioner] had been arrested, Fletcher told her it was [Petitioner's] and she knew [Petitioner] was selling drugs in order to buy a motorcycle.

United States District Court
For the Northern District of California

> Other evidence was presented that [Petitioner] wrote one or more letters from jail to Fletcher and Ruiz in which he asked about putting money down on the motorcycle he wanted to buy, requested pictures of the motorcycle and drew a picture of a motorcycle on the letter.
>
> We see no abuse of discretion.

*Jimenez*, 2007 WL 215075 at *12.

Petitioner argues that the trial court's exclusion of this evidence prevented him from introducing relevant evidence that would raise a reasonable doubt as to his guilt. However, even if this information was admitted, it would not have significantly undermined Fletcher's credibility since, as the state appellate court noted, the jury was presented with other credible evidence that Petitioner was interested in buying a motorcycle. Olivia Ruiz testified that she overheard Petitioner and Fletcher discussing Petitioner's desire to buy a motorcycle. (Ans., Ex. B at 1921–22.) In addition, evidence was presented that Petitioner wrote letters from jail about putting money down on the motorcycle and requested pictures of the motorcycle.

Petitioner has not established that his right to present a complete defense against the charges against him was violated by the trial court's refusal to admit testimony regarding Fletcher's purchase of a motorcycle with proceeds from Fletcher's criminal activity. Accordingly, the state appellate court's rejection of this claim was neither contrary to, nor an unreasonable application, of clearly established federal law; nor was it based on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on this claim.

**B. Admission of Evidence**

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)).

United States District Court
For the Northern District of California

**1) Cell Phone Records**

Petitioner argues that the trial court admission of cell phone records and related expert testimony violated his constitutional rights because the prosecution failed to meet the *Kelly-Frye* standard with regard to this evidence. The *Kelly-Frye* standard is the California state law standard "by which new scientific techniques should be measured before evidence derived therefrom may be admitted in court." *People v. Leahy*, 8 Cal. 4th 587, 612 (1994). However, federal habeas corpus relief does not lie for errors of state law, unless the error amounts to a deprivation of the petitioner's constitutional rights. *See Estelle v. McGuire*, 502 U.S. 62, 67–69 (1991). Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation. *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). After a review of the record, the Court finds that the admission of the cell phone records and related expert testimony did not result in a denial of the fundamentally fair trial guaranteed by due process.

At trial, the prosecution presented evidence showing the location of several cell phones from which calls were made to or from during the time of the murder. One of the phones belonged to Petitioner; one phone was linked to Cornejo; and a third was linked to Rodriguez. In presenting this evidence, the prosecution relied on cell phone records and on expert testimony that, as a rule, a cell phone uses the cell phone tower closest to it to transmit or receive a call.

Petitioner argues that this evidence was not scientifically reliable and that its admission violated his constitutional rights. Specifically, he argues that the cell phone testimony showing the locations of the callers was a major part of the prosecution's case and the jury reviewed this evidence as scientifically reliable. However, as the state appellate court noted, Petitioner's objections go to the weight of the evidence. Defense counsel's cross-examination adequately challenged the reliability of the expert evidence, and the jury instructions properly instructed the jury as to how to evaluate expert testimony,[10] and juries are presumed to follow the court's instructions,

---

[10]The jury was instructed as follows: "In determining what weight to give to any opinion expressed by an expert witness, you should consider the qualifications and believability of the witness, the facts or materials upon which each opinion is based, and the reasons for each opinion. An opinion is only as good as the facts and reasons on which it is based. If you find that any fact has not been proved, or has been disproved, you must consider that in determining the value of the opinion. Likewise, you must consider the strengths and weaknesses of the reasons on which it is based. You are not bound by an opinion. Give each opinion the weight you find it deserves. You may disregard

*Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

Moreover, there were permissible inferences that the jury could draw from this evidence as to where the cellphones were located when the calls were made. *C.f. Pullin v. State*, 272 Ga. 747, 749 (2000) (upholding trial court finding that the expert testimony regarding the accuracy and reliability of cell phone records establishing the location of a tower which services a particular cellular cage was based on sound scientific theory), and *United States v. Dhinsa*, 243 F.3d 635, 661 (2d. Cir. 2001) (cellular phone records confirmed defendant's locations during the time surrounding the crime). Petitioner cannot demonstrate that such evidence rendered his trial fundamentally unfair to the extent of a due process violation. Accordingly, the state court's rejection of this claim was neither contrary to, nor an unreasonable application, of clearly established federal law; nor was it based on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on this claim.

**2) <u>Fletcher's Opinion Testimony about Petitioner's Involvement in the Shooting</u>**

During trial, testimony from the homicide detective and from Fletcher established the following: in Fletcher's initial interview with the detective, Fletcher stated that his personal opinion was that Petitioner had committed the murder himself and that he did not believe that Petitioner had sent others to do the killing. On cross-examination by co-defendant's counsel, Fletcher further stated that he didn't believe Petitioner had the "street connections" to order other Norteños to do something. (Ans., Ex. B at 1886.) Petitioner argues that the Fletcher's opinion testimony that Petitioner had personally shot the victim was irrelevant and inflammatory and its admission violated Petitioner's constitutional rights to due process and a fair trial.

The state appellate court rejected Petitioner's claim as follows:

> During Fletcher's testimony, he was questioned about his interview with Detective Melchert. When codefendant's counsel asked if he remembered telling the detective that he (Fletcher) didn't believe [Petitioner] when [Petitioner] said he sent other people to kill Mongo, Fletcher said he didn't remember and he didn't know if he believed [Petitioner]. He did remember saying that he didn't think [Petitioner] had the ability to send others to do something. The prosecutor's objection to this testimony was overruled. Later, when Detective Melchert was testifying about Fletcher's interview, codefendant's counsel

---

any opinion if you find it to be unreasonable." (Ans., Ex. A at 1446.)

United States District Court
For the Northern District of California

> established that according to the transcript of the interview, Fletcher stated that he didn't believe what [Petitioner] was telling him because he didn't believe [Petitioner]"had the juice" to send the Norteños. Detective Melchert said he did not recall being in the room for this part of the interview. When [Petitioner's] counsel then objected to the prosecutor eliciting evidence that in Fletcher's opinion [Petitioner] did the shooting alone, noting that Melchert was not in the room, the trial court ruled that Melchert could not comment on what Fletcher said if Melchert was not present at the time. The court also stated that pursuant to Evidence Code section 356, all counsel would be allowed to go into Fletcher's statement in its entirety because they had virtually the entire statement. The prosecutor then established through Melchert that, according to the transcript of the interview, Fletcher said he was only giving his personal opinion and didn't know who was involved in the crime beyond what [Petitioner] had told him. During a later discussion about admitting a redacted version of the tape and transcript of the interview, [Petitioner's] counsel called Fletcher's opinion irrelevant and inadmissible speculation. The trial court explained that it was somewhat relevant to Fletcher's credibility, and the prosecutor noted that [Petitioner's] counsel had not objected to the evidence when it was originally adduced by codefendant's counsel.
>
> [Petitioner] now asserts that Fletcher's opinion statements should not have been admitted because they were not relevant and thus Evidence Code section 356 should not protect their admission. (*See People v. Williams* (1975) 13 Cal.3d 559, 565.) [Petitioner] further argues that this type of lay opinion testimony about the veracity of certain statements by another person is inadmissible, especially on the ultimate question of guilt or innocence. (*See People v. Melton* (1988) 44 Cal.3d 713, 744; *People v. Torres* (1995) 33 Cal.App.4th 37, 46-47.)
>
> The Attorney General points out that [Petitioner] did not raise a timely or specific objection when testimony of Fletcher's statements was first admitted. [Petitioner] maintains that he relied on the prosecutor's objection. [Petitioner] objected to subsequent evidence from the prosecutor that Fletcher was merely offering his opinion. At that point, the jury had already heard about most of Fletcher's statements to the police without this objection being raised by [Petitioner]. Fletcher himself had been impeached with inconsistent or changing statements and could not be viewed as a reliable witness. Moreover, the prosecutor did not argue to the jury that [Petitioner] had by himself shot the victim.
>
> The trial court did not abuse its discretion in admitting this evidence.

*Jimenez*, 2007 WL 215075 at *12–*13.

Petitioner argues that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented at trial. Specifically, Petitioner argues that the state court based its decision on an incorrect factual finding that Fletcher had already been impeached by inconsistent or changing statements, and that Fletcher could not be viewed as a reliable witness. Petitioner argues that since he was convicted after the prosecution argued Fletcher's credibility and relied on Fletcher's testimony, the jury must have found Fletcher to be credible.

Petitioner's argument is without merit. Petitioner mischaracterizes the state court's adjudication of this claim. The state court found that admission of Fletcher's opinion testimony was

a decision subject to the trial court's discretion and that the record indicated that the admission was not an abuse of the trial court's discretion.

After reviewing the record, this Court concludes that the record does not support a finding that the admission of Fletcher's opinion rendered the trial fundamentally unfair. The prosecution did not rely on the challenged portion of Fletcher's opinion testimony. In fact, the prosecution did not argue that Petitioner personally shot the victim. (Ans., Ex. B at 3475.) Nor did the prosecution rely solely on Fletcher's testimony and credibility to argue Petitioner's guilt. As acknowledged in Petitioner's other habeas claims, the prosecution also relied on co-defendant Cornejo's guilt and cell phone records and related expert testimony to argue Petitioner's guilt. Finally, Fletcher himself discounted the weight of his opinion testimony; he acknowledged that this was merely his own "personal opinion" and that he didn't know if this opinion was correct. (Ans., Ex. B at 2517.) Accordingly, the state appellate court decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court now, nor was it based on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on this claim.

**3) <u>Fletcher's Statements about Norteños</u>**

Finally, Petitioner argues that Fletcher's testimony as to the "homicidal tendencies" of Norteño gang members also violated his constitutional rights to due process and a fair trial. The state appellate court rejected Petitioner's claim as follows:

> During Harvey Fletcher's testimony, he acknowledged that he could have said to the police, "Yeah, it's dangerous, [Norteños] will kill you just as soon as look at you, they will kill your whole family." The trial court overruled [Petitioner's] objection on grounds of relevance and undue prejudice under Evidence Code section 352. [Petitioner] now claims that the trial court had no discretion to admit the evidence because it was irrelevant (<u>see</u> *People v. Crittenden*, *supra*, 9 Cal.4th at p. 132) and that this wrongful admission of prejudicial evidence in addition to other trial court errors violated his federal right to due process. (*See Estelle v. McGuire* (1991) 502 U.S. 62; *McKinney v. Rees* (9th Cir.1993) 993 F.2d 1378.) We disagree.
>
> Although the record is unclear, it appears the trial court did order that specific comment redacted from the tape of the interview admitted into evidence. However, as the Attorney General points out, other statements critical of Norteños and their violent behavior remained in the tape of the interview.[11] The Attorney General further points out

[11]"These kids are young and they don't care about life, okay? They don't care about your life, my life, anybody's life, okay? This is Norteños, okay?" "But anything outside of the family, they have no-total disregard for your life, okay? They would shoot you just like they shot that kid."

United States District Court
For the Northern District of California

> that Fletcher said only that he could have made the statement in question. Apparently, when the jury heard the tape of the interview, that statement had been redacted, so the jury did not hear Fletcher make the statement during the interview. In addition, two expert witnesses (one police officer and one gang member) testified at trial about gang culture and why one member of a gang, like [Petitioner], might have killed another member of the same gang.
>
> A trial court's ruling on evidentiary objections of relevance and undue prejudice is within its discretion. (*See People v. Mincey*, *supra*, 2 Cal.4th at p. 439.) This ruling was not an abuse of discretion.

*Jimenez*, 2007 WL 215075 at *13–*14 (footnote in original, renumbered). Petitioner argues that the state court's decision was in error because (1) it fails to recognize that it would be prejudicial to admit any testimony implying that Norteños had a disregard for human life and any such testimony would prevent Petitioner from obtaining a fair trial and (2) neither of the expert witnesses confirmed Fletcher's testimony regarding the homicidal tendencies of Norteños.

Petitioner misunderstands the state court's reasoning. The state court denied relief on this claim for the following reasons: because the statement at issue was not presented to the jury, because Fletcher only stated that he could have made that statement, and because the expert witnesses provided testimony as to specific reasons a gang member might kill other gang members and other testimony indicated that Petitioner might have been motivated by the reasons cited by the experts (e.g., respect). In short, the state court concluded after examining the record that the trial court did not abuse its discretion in finding that testimony critical of Norteño gang culture was relevant. The record supports the state court's denial of relief on this claim. Accordingly, the state court's rejection of this claim was neither contrary to, nor an unreasonable application, of clearly established federal law; nor was it based on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on this claim.

## IV. <u>Ineffective Assistance of Trial Counsel</u>

Petitioner brings three claims based on ineffective assistance of trial counsel: 1) trial counsel was ineffective for failing to conduct a reasonable pre-trial investigation, specifically with regard to the murder weapon; 2) trial counsel was ineffective for failing to object to the prosecution's expert witness and for failing to object to certain evidence; and 3) trial counsel was ineffective for failing to provide rebuttal expert witnesses regarding cell phones, gangs, and forensic evidence. These claims were not addressed by the state court in a reasoned decision. Thus, this Court has conducted an

independent review of the record to determine whether the California Supreme Court's summary denial of the claims on state habeas corpus was an objectively unreasonable application of clearly established federal law. *Plascencia*, 467 F.3d at 1198.

A claim of ineffective assistance of trial counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, the petitioner first must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687–88. Secondly, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

It is unnecessary for a federal court considering an ineffective assistance of counsel claim on habeas review to address the prejudice prong of the *Strickland* test if the petitioner cannot establish incompetence under the first prong. *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). Similarly, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as the result of the alleged deficiencies. *See Strickland*, 466 U.S. at 697.

"A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 689). The standards of both 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential . . . and when the two apply in tandem, review is doubly so." *Id.* at 788 (quotation and citations omitted). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

**A. <u>Reasonable Pre-trial Investigation</u>**

Petitioner argues that defense counsel's failure to determine who gave Petitioner his gun in the late 1970s and to whom Petitioner gave the gun in the 1990s constituted ineffective assistance of

counsel. Petitioner claims that this information would have demonstrated that the murder weapon was not the same as the gun previously owned by Petitioner. Petitioner first presented this argument in his second state habeas petition which was filed in the California Supreme Court and denied with citations to *In re Clark*, 5 Cal. 4th 750 (1993) and *In re Swain*, 34 Cal. 2d 300, 304 (1949). (Ans., Ex. I.) In this second habeas petition filed in the California Supreme Court, Petitioner attached an undated email from the investigator to defense counsel requesting additional help, which he alleges proves that defense counsel did not make a reasonable pre-trial investigation. (Ans., Ex. I.)

A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *See Strickland*, 466 U.S. at 691; *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011). *Strickland* directs that "'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691). The failure to investigate a defense may not be ineffective assistance where it was due to the defendant's failure to inform the attorney of relevant facts. *See, e.g.*, *Cox v. Del Papa*, 542 F.3d 669, 682–83 (9th Cir. 2008) (finding no ineffective assistance of counsel resulting from counsel's failure to present evidence at sentencing of petitioner's prior drug use where petitioner continuously and strenuously protested when counsel suggested his behavior was the result of drug use).

Petitioner's vague assertions require the Court to speculate as to the scope of the investigation conducted and what might have been discovered had additional investigation been conducted. Petitioner does not explain how the information regarding who gave Petitioner the gun and to whom Petitioner gave the gun would prove that his gun was not the murder weapon. Nor does the investigator's undated email conclusively prove that defense counsel did not make a reasonable pre-trial investigation.

Moreover, the record shows that defense counsel directly addressed and called into question whether Petitioner's gun was the murder weapon. Defense counsel highlighted testimony that called into question whether Petitioner still had the gun in his possession. Specifically, Petitioner's father testified that in 1999, he was responsible for some of Petitioner's possessions and he did not find a

United States District Court
For the Northern District of California

gun among Petitioner's possessions, (Ans., Ex. B at 3142), and Petitioner's ex-wife testified that she asked Petitioner to get rid of the gun in the 1980s and had not seen the gun since then, (Ans., Ex. B at 1317). Defense counsel also elicited testimony from prosecution witness Detective Ahearn that after interviewing Petitioner's family and other witnesses, Detective Ahearn had originally concluded that Petitioner owned a 410-gauge gun while the murder weapon had been determined to be a 20-gauge gun. (Ans., Ex. B at 1345–47.)

After an independent review of the record, the Court concludes that Petitioner's conclusory argument and the vague email from the investigator are insufficient to demonstrate that there is no reasonable argument that defense counsel satisfied the deferential standard under 28 U.S.C. § 2254 and *Strickland*. Accordingly, the state court's rejection of this claim was neither contrary to, nor an unreasonable application, of clearly established federal law; nor was it based on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on this claim.

**B. <u>Failure to Exclude Expert Witness Testimony and Certain Evidence</u>**

Petitioner's second ineffective assistance claim is that trial counsel "failed to object specifically to prosecutor's expert witness who was not qualified under the *Daubert* test," "did not object to evidence concerning co-defendant that was wrongly admitted," and "throughout trial . . . failed to make timely and specific objections which Attorney General also stated." Petition at 8, 17. Petitioner raised these claims for the first time in his second state habeas petition. (Ans., Ex. I.)

Petitioner's claim regarding the qualification of the prosecution's expert witness is without merit. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), is based on a federal rule of evidence, not the Constitution. *Id.* at 594–95. For that reason, California courts are not required to apply it, and in fact do not. *See People v. Leahy*, 8 Cal. 4th 587, 594 (1994). Accordingly, even if the prosecution's expert witness was not qualified under *Daubert* (which has not been demonstrated by Petitioner), trial counsel's failure to challenge the expert witness as unqualified under *Daubert* would not constitute ineffective assistance of counsel. *See, e.g., Juan H. V. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (trial counsel cannot have been ineffective for failing to raise a meritless objection).

In arguing that trial counsel was ineffective for failing to object to "evidence concerning co-

United States District Court
For the Northern District of California

defendant that was wrongly admitted," Petitioner appears to be attempting to re-argue whether the prosecutor should have been allowed to argue Petitioner's guilt based on evidence of Cornejo's culpability despite the trial court's finding that there was insufficient evidence to convict Cornejo. In rejecting this argument, the state appellate court stated, "[Petitioner] raises no claim that the evidence concerning Cornejo was somehow wrongly admitted or violated his rights to due process and a fair trial. The prosecutor was entitled to refer to that evidence in making his case to the jury. The jury itself was charged and instructed with finding the requisite evidence to conclude that [Petitioner] was guilty of murder beyond a reasonable doubt. We see no error." *Jimenez*, 2007 WL 215075 at *9. Petitioner appears to be arguing that defense counsel should have raised a claim that the evidence concerning Cornejo was wrongly admitted so that the prosecution would have been precluded from referring to that evidence in its closing arguments. However, simply because the evidence was insufficient as a matter of law to convict Cornejo does not mean that the evidence was wrongly admitted. Accordingly, trial counsel's failure to object to evidence admitted regarding Cornejo was not ineffective assistance.

Petitioner's claim regarding trial counsel's general failure to object throughout trial also appears to be an attempt to re-argue issues already decided by the state appellate court. Petitioner appears to be arguing that to the extent that the state appellate court denied relief on his claim of evidentiary errors (admission of evidence of cell phone calls and of Fletcher's opinion testimony about Petitioner's personal involvement in the murder) based on trial counsel's failure to object at trial, the failure to object constituted ineffective assistance. However, the state appellate court denied these evidentiary error claims on the merits and not because of trial counsel's failure to object. With regard to the evidence of cell phone calls, the state appellate court rejected the Attorney General's argument that Petitioner had waived the argument by failing to object at trial and proceeded to consider the merits of the claim. *Id*. at *11. Therefore, Petitioner was not prejudiced by trial counsel's failure to make a specific objection regarding the lack of expert testimony on "the scientific mechanism used to generate cell phone records identifying which cell tower a call connected through" and regarding whether the expert's opinion was reliable as to the location of a caller in relation to a cell tower. *Id.* at *10. With regard to whether the admission of Fletcher's

opinion statements regarding the shooting was an evidentiary error, the state appellate court only relied in part on trial counsel's failure to object in rejecting this claim. The state appellate court denied this evidentiary claim on additional grounds, including the fact that this information was relevant to Fletcher's credibility; Fletcher had been impeached and could be viewed as an unreliable witness; and the prosecutor was not arguing that Petitioner had shot the victim. *Id.* at *13. Given the strong presumption that counsel's representation was within the wide range of reasonable professional assistance and the lack of prejudice to Petitioner, trial counsel's failure to object did not constitute ineffective assistance of counsel. Accordingly, the state court's rejection of this claim was neither contrary to, nor an unreasonable application, of clearly established federal law; nor was it based on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on this claim.

### C. <u>Failure to Provide Rebuttal Expert Witnesses</u>

Petitioner also argues that trial counsel was ineffective because he failed to provide expert witnesses to rebut the prosecution's expert witnesses. Specifically, Petitioner alleges that trial counsel should have provided rebuttal expert witnesses regarding cell phones, gangs and forensic evidence. Petition at 18. However, Petitioner does not proffer any evidence to show that such experts would have provided favorable testimony. Without such a proffer, the Court can only speculate about the nature and substance of the rebuttal experts' testimony, which is insufficient to support a finding of prejudice. *See Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir.1997) ("Speculation about what an expert could have said is not enough to establish prejudice."). Accordingly, trial counsel's failure to object did not constitute ineffective assistance of counsel. The state court's rejection of this claim was neither contrary to, nor an unreasonable application, of clearly established federal law; nor was it based on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on this claim.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES the Petition for Writ of Habeas Corpus as to all claims. A certificate of appealability will not issue. Reasonable jurists would not find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S.

United States District Court
For the Northern District of California

473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals. The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED: September 13, 2012

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**